Oliver T. CARR, Jr., Trustee et al.

v.

DISTRICT OF COLUMBIA, a Municipal Corporation et al. United States of America, Appellant.

No. 79–1571.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 30, 1980.

Decided Dec. 18, 1980.

---

Carl Strass, Atty., Dept. of Justice, Washington, D. C., with whom Dirk D. Snell, Atty., Dept. of Justice, Washington, D. C., was on brief, Sanford Sagalkin, James W. Moorman and James C. Kilbourne, Attys., Dept. of Justice, Washington, D. C., for appellant United States of America.

William Joseph H. Smith, Washington, D. C., with whom S. Lamont Bossard, Jr., Redondo Beach, Cal., was on brief, for appellees.

Before ROBINSON, WILKEY and GINSBURG, Circuit Judges.

GINSBURG, Circuit Judge:

In one of the most successful examples of urban development based upon cooperation between government and the private sector, Maryland landowners and trustees appointed by President George Washington arranged in 1791 for transfers of land to establish a Federal City, later named Washington.[1] In this action and similar litigation in the Court of Claims[2] and District of Columbia courts,[3] latter twentieth century real estate developers have rehearsed the history of the creation of the nation's capital. The context is a dispute over the District's current authority to impose a charge upon closing an "original alley," *i. e.,* an alley located within the original boundaries of the City.

The most thorough ventilation of the alley-closing dispute occurred in the District of Columbia courts. Recently authenticated original documents preserved in the National Archives were carefully studied, and all issues raised in this proceeding were fully and fairly litigated in the parallel proceeding before the D.C. Superior Court and Court of Appeals. We conclude, as did District Court Judge Thomas A. Flannery, ruling on cross-motions for summary judgment,[4] that the adjudication in the District of Columbia courts merits full credit here. Accordingly, we affirm the District Court's judgment.

### I. Background

*D.C. Alley-Closing Authority*

The D.C. Code authorizes the City Council to close public alleys it finds "useless or unnecessary."[5] Upon closure, title to the alley space reverts to the owners of the abutting property, and ordinarily no fee

---

1. For discussion of the history of the founding of the Federal City, *see Morris v. United States,* 174 U.S. 196, 250–59, 19 S.Ct. 649, 671–74, 43 L.Ed. 946 (1899) (with maps at 220–21, 19 S.Ct. at 660–61); *Van Ness v. City of Washington,* 29 U.S. (4 Pet.) 232, 7 L.Ed. 842 (1830).

2. *Washington Medical Center, Inc. v. United States,* 545 F.2d 116 (Ct.Cl.1976), *cert. denied,* 434 U.S. 902, 98 S.Ct. 296, 54 L.Ed.2d 188 (1977), *petition for relief from judgment denied sub nom. 1776 K Street Associates v. United States,* 602 F.2d 354 (Ct.Cl.1979).

3. *Chesapeake & Potomac Telephone Co. v. District of Columbia,* 106 Daily Wash.L.Rep. No. 114 (D.C.Super.Ct. March 28, 1978), *aff'd sub nom. United States v. Chesapeake & Potomac Telephone Co.,* 418 A.2d 114 (D.C.1980) ("*C&P Telephone*").

4. *Carr v. District of Columbia,* Civil Action No. 77–445 (D.D.C. January 12, 1979) ("*Carr III*"), *reprinted in* Joint Appendix ("J.A.") 44–54.

5. Street Readjustment Act § 1, D.C. Code § 7–401 (West Supp.1979). In an earlier contest, Judge Sirica observed that a principal economic purpose of this Act was "elimination of barriers to real estate development in the District." *Carr v. District of Columbia,* 312 F.Supp. 283, 286 (D.D.C.1970), *aff'd without opinion,* No. 24,406 (D.C.Cir.1971) ("*Carr I*").

may be charged,[6] unless the United States holds title to the land on which the alley stood. If the land is owned by the United States, the District of Columbia may dispose of it "to the best advantage of the locality." One method of disposition specifically identified in the Code is a cash sale at fair market value.[7] If the D.C. Council elects the cash sale option, the sale proceeds must be paid into the United States Treasury.[8]

It is undisputed that for decades the District government did not elect the cash sale option. The City Council commenced imposing fair market value charges for closing original alleys in 1967.[9] At that time, it was generally assumed that alleys within the original Federal City boundaries were owned by the United States.[10] This assumption, the Superior Court declared, was incorrect. In a comprehensive opinion,[11] Judge John Garrett Penn determined, largely from the documents found in the National Archives and not theretofore fully presented to any court, that title to the

"original alleys" was not and never had been in the United States. Rather, Judge Penn concluded, Federal City parcels, as first sold to members of the public, encompassed both lot and adjacent alley space. He held, therefore, that on closure of an original alley, title reverted to the abutting property owners under the applicable terms of the D.C. Code, and no sale charge could be imposed. In an appeal brought solely by the United States,[12] the D.C. Court of Appeals affirmed.

*The Issue Preclusion Question*

The United States urges no facts, issues or argument here that it did not raise in its presentation to the D.C. Court of Appeals. Indeed, its brief in this court simply reruns the points it made, unsuccessfully, in the appellate court across the street. Nevertheless, the United States insists that fresh decision by this court is mandated because the judgments of the D.C. Superior Court and Court of Appeals, in favor of plaintiffs not before this court,[13] are themselves in-

---

**6.** The Council may exact a protective payment from the closure applicant when there is a risk of damage to neighboring property for which the District might be liable. *Id.* at 285.

**7.** D.C. Code § 7–401 (West Supp.1979); *id.* § 7–302 (West 1966).

**8.** *Id.* § 7–325. For fuller description of the relevant D.C. Code provisions, *see Carr v. District of Columbia*, 543 F.2d 917, 919–24 (D.C. Cir.1976) (*"Carr II"*).

**9.** Exorbitant statements appear in the opening brief suggesting that United States consent is necessary to close an original alley and that the United States may "charge any sum it wishes" for the closing. Brief for the United States at 17, 18, 22–23. These indulgences in wishful thinking were not repeated at oral argument.

Beyond debate, the Street Readjustment Act, *supra* note 5, provides no role for the United States in decisions concerning alley closings. In fact, the United States conceded that it "did not involve itself in any decision, past or present, to charge or not to charge for the closing of [original] alleys, that it did not involve itself in the decision to begin charging for the alley closings in 1967," and that it does not take part in deciding how much to charge for an alley closing, or indeed, whether to charge anything at all. *C&P Telephone, supra* note 3, 106 Daily Wash.L.Rep. at p. 1071.

**10.** The assumption prevailed for over 175 years. *Washington Medical Center, supra* note 2, 545 F.2d at 126.

**11.** *C&P Telephone, supra* note 3 (D.C.Super.Ct. March 28, 1978).

**12.** The *C&P Telephone* case, and the litigation here, were similarly styled as actions for declaratory relief. The complaints named only the District of Columbia and the District of Columbia Council as defendants. Plaintiffs sought declarations that the District lacked statutory authority to condition closing of the alleys in question upon payment of a sale charge. Judge Penn in the Superior Court, *C&P Telephone, supra* note 3, 106 Daily Wash. L.Rep. at p. 1070–71, and Judge Flannery in the District Court, *Carr v. District of Columbia*, 371 F.Supp. 293, 296–97 (D.D.C.1974), *aff'd without opinion*, 521 F.2d 324 (D.C.Cir.1975), *modified and rehearing denied*, 543 F.2d 917 (D.C.Cir. 1976) (*"Carr II"*), held that the United States was not an indispensable party to the proceedings. In both cases, however, the United States participated actively before the trial courts and, as intervenor, appealed both decisions. The District of Columbia did not join in the appeal to the D.C. Court of Appeals.

**13.** The plaintiffs in the District of Columbia courts were Chesapeake & Potomac Telephone Co., The Supreme Council, 6th & E Street, Inc.,

consistent with an earlier judgment rendered by the Court of Claims.[14]

Our reconsideration, unencumbered by the adjudication in the District of Columbia courts, is invited on two further grounds. First, the United States contends that the District of Columbia courts lacked subject matter jurisdiction over the controversy. It characterizes the District of Columbia action, and the one before us, as quiet title suits in which federal court jurisdiction is exclusive.[15] Second, the United States maintains that a "pure question of [federal] law" is at stake, an issue on which the decision of a nonfederal court should not bind a federal tribunal.

To explain our conclusion that the United States offers no sound reason for denying full credit to the adjudication in the District of Columbia courts, we set out first the sequence of litigation in the District Court and this court, in the Court of Claims, and in the District of Columbia courts. Thereafter, we consider application to the case before us of the rule of issue preclusion,

sometimes referred to as collateral estoppel, the rule that a party, having fully and fairly litigated an issue on a previous occasion, may not relitigate that issue.[16]

*Litigation on Three Fronts*

*Carr v. District of Columbia,* 371 F.Supp. 293 (D.D.C.1974), *aff'd without opinion,* 521 F.2d 324 (D.C.Cir.1975), *modified and rehearing denied,* 543 F.2d 917 (D.C.Cir. 1976) (*"Carr II"*).

Appellees Oliver T. Carr, Jr. and George H. Beuchert, Jr., as trustees for 1800 M Associates,[17] held legal title to property abutting an original alley. On December 7, 1971, Carr and Beuchert applied for the closing of the alley in order to construct a building on land encompassing the alley space and the several lots surrounding it. Pursuant to a resolution adopted by the D.C. Council on June 6, 1972, the alley was closed on December 12, 1972. Construction commenced thereafter and an office building now stands on the property.

Application of preclusion rules in an interjurisdictional context in the United States has a constitutional dimension. Under the full faith and credit clause, U.S.Const. Art. IV, § 1, and the federal statute associated with it since 1790, 28 U.S.C. § 1738 (1977), it is the general rule that judgments are to have no lesser preclusive effects in any court within the United States than they have in the court from which they are taken. *See* Restatement (Second) of Judgments, *supra,* § 134, at 71–83; *cf.* Restatement (Second) of Conflict of Laws § 95, comment g.

---

Sylvan C. German and Saul H. Bernstein, Ulysses and Lulu Auger, Bicentennial Associates, and Washington Medical Center, Inc. J.A. 87.

**14.** *Washington Medical Center, Inc. v. United States, supra* note 2. The plaintiffs in the consolidated Court of Claims proceedings were Washington Medical Center, Inc., William J. and Frances S. Cusack, Mary C. Morgan, 1776 K Street Associates, Metropolitan Club of the City of Washington, D. F. Antonelli, Jr. and Jack Kogok. *Id.* at 118–19.

**15.** *See* 28 U.S.C. § 1346(f) (1977).

**16.** *See* Restatement (Second) of Judgments ch. 1, introduction at 1 (Tent. Draft No. 7, 1980). In the traditional terminology, res judicata refers to the preclusive effect of a judgment on the claim involved, while collateral estoppel concerns the judgment's preclusive effect on issues involved. *Id.* at 4. Claim preclusion and issue preclusion are more descriptive labels for the same concepts.

It was once the rule that a person who did not participate in a prior action, and therefore was not bound by the judgment there, could not invoke issue preclusion against a party to the prior adjudication. This "mutuality of estoppel" rule has undergone erosion to the point where it is now generally held in the federal courts and in many state courts that "a party who loses the contest of an issue against one adversary is ordinarily precluded from relitigating it against any other adversary." *Id.* at 9.

**17.** And now trustees of the successor venture, Square 140 Associates.

In an earlier District Court action, Carr successfully resisted an alley-closing charge the District sought to impose. In that action, alley ownership by the United States was not raised by the parties or discussed by the court. With the "original alley" issue absent from the controversy, Judge Sirica ruled for the plaintiffs, holding that the Street Readjustment Act, *supra* note 5, limited charges to cases in which the District needed protection against future liability to neighboring property owners whose parcels might be adversely affected by the closing. *Carr v. District of Columbia,* 312 F.Supp. 283 (D.D.C.1970), *aff'd without opinion,* No. 24,406 (D.C.Cir.1971) (*"Carr I"*).

The City Council conditioned the alley closing upon payment of $196,200, representing the fair market value of the land contained in the alley. Carr and Beuchert disputed the Council's authority to impose the sale charge, although they did not then question United States ownership of the alley. By agreement with the Corporation Counsel, the $196,200 were deposited in escrow with The Riggs National Bank pending judicial determination whether the charge was lawfully imposed.

In January 1973, Carr and Beuchert filed an action in the District Court seeking a declaration that the City Council could not exact a price for the alley space closed. They invoked the jurisdiction the District Court then had in civil actions brought in the District of Columbia where the amount in controversy exceeded $50,000.[18] All agreed that the alley in question was an original alley. Based upon that undisputed fact, Judge Flannery concluded that the Council had authority to sell the property at market value for the account of the United States.

Carr and Beuchert assumed for purposes of the contest that the United States owned the alley. They rested their case on two statutory construction arguments. First, they maintained that, under the relevant D.C. Code provision,[19] the sale authority came into play only when the Council could not otherwise dispose of the alley space in a manner advantageous to the locality. Second, they urged that sale authority was confined to cases in which the District closed a United States alley on its own initiative. Judge Flannery found both arguments insubstantial and this court agreed with his analysis.

While the appeal was under submission, Carr and Beuchert filed motions asserting for the first time in this litigation that the generally held assumption concerning United States ownership of original alleys was erroneous. This dramatic new assertion was not considered by the court because it lacked support in the record. On petition for rehearing, however, the panel explicitly preserved to plaintiffs an opportunity to bring an independent action for relief from the judgment based on the historical evidence recently explored at the National Archives.[20]

> *Washington Medical Center, Inc. v. United States*, 545 F.2d 116 (Ct.Cl.1976), *cert. denied*, 434 U.S. 902, 98 S.Ct. 296, 54 L.Ed.2d 188 (1977), *petition for relief from judgment denied sub nom. 1776 K Street Associates v. United States*, 602 F.2d 354 (Ct.Cl.1979).

Shortly after the final disposition in *Carr II*, the Court of Claims addressed the District's authority to charge for original alley closings. In a decision consolidating four cases, the earliest commenced in 1972, the latest in 1975, that court adhered to the traditional understanding. It declared the United States owner of the alleys, and therefore held that the closing charges were lawfully imposed by the D.C. Council and properly deposited in the Treasury. The plaintiffs in *Washington Medical Center* did attempt to show that the first purchasers of original Federal City lots also paid for portions of the alleys. However, the Archives study was still in progress and the plaintiffs were not yet in a position to support their contention with convincing evidence.

The Court of Claims found that the proof plaintiffs did submit lacked "probative value." 545 F.2d at 126. It characterized plaintiffs' ownership contention as "after-

---

**18.** D.C. Code § 11–501(4) (West Supp.1970). This provision is part of the District of Columbia Court Reorganization Act of 1970, P.L. No. 91–358, 84 Stat. 473; it continued District Court jurisdiction for a 30-month transition period. *See generally* Williams, *District of Columbia Court Reorganization, 1970*, 59 Geo.L.J. 483 (1971).

**19.** D.C. Code § 7–401 (West Supp.1979).

**20.** *Carr II*, 543 F.2d at 929. Although the one-year time limit applicable under Fed.R.Civ.P. 60(b) had expired, timeliness of an independent action is determined less woodenly by doctrines of laches and due diligence. *See* Restatement (Second) of Judgments § 127, at 121–22, 125 (Tent. Draft No. 6, 1979) (indicating as the sounder approach removal of the fixed time limit for Rule 60(b) relief).

thought," and suggested that, in any event, plaintiffs were not comfortably situated to raise the issue. They had paid the alley-closing charges fixed by the D.C. Council without protest, and might have been stopped at the threshold on that account. It was unseemly, the Court of Claims thought, for plaintiffs to claim back from the Treasury amounts they had willingly paid to get the alleys closed. *Id.* at 120–21.

After the Archives research turned up more secure evidence, some of the *Washington Medical Center* plaintiffs sought rehearings, and later petitioned for relief from the judgment. The Court of Claims declined to reconsider, noting again plaintiffs' voluntary payment of the charges, and stressing plaintiffs' voluntary submission of the case for expedited treatment on incomplete evidence. Had the plaintiffs sought to delay adjudication pending full development of the new evidence, the court would have been accommodating. 602 F.2d at 357. Significantly, the Court of Claims indicated it did not expect that its 1976 judgment would have "an adverse collateral estoppel or res judicata effect on other cases." *Id.* at 358.

> *Chesapeake & Potomac Telephone Co. v. District of Columbia*, 106 Daily Wash.L. Rep. No. 104 (D.C.Super.Ct. March 28, 1978), *aff'd sub nom. United States v. Chesapeake & Potomac Telephone Co.*, 418 A.2d 114 (D.C.1980) ("*C&P Telephone*").

Largest of the alley-closing controversies, *C&P Telephone* was commenced in the D.C. Superior Court in 1975, before *Washington Medical Center* was decided, and while *Carr II* was pending in this court. The proceeding consolidated six cases instituted by owners of several parcels of realty in downtown Washington. Each parcel abutted an original alley. As in *Carr*, the alley-closing payments set by the D.C. Council were deposited in escrow pending judicial determination of the Council's authority to impose the charges.

A full dress presentation followed, including testimony and argument. Center stage in the presentation was a detailed exploration of ancient material both in court and at the National Archives. Items spread before the court included deeds, maps, records of land divisions and dispositions, legal opinions and correspondence, legislative enactments, presidential proclamations and building regulations, all contemporaneous with the establishment of the Federal City. We have already recounted the end-product of the *C&P Telephone* litigation. (Then) Superior Court Judge John Garrett Penn ruled, and a unanimous D.C. Court of Appeals panel affirmed, that (1) the D.C. Council lacked authority to charge for the alley closings and (2) the realty owners were entitled to return of the money held in escrow.

> *Carr v. District of Columbia*, Civil Action No. 77–445 (D.D.C. January 12, 1979) ("*Carr III*").

After this court's 1976 remand, plaintiffs promptly instituted an independent action [21] and Judge Flannery denied a motion to dismiss it. In the unique circumstances presented, he concluded, Carr and Beuchert ought not be tied to the initial judgment. Plaintiffs had searched with diligence all available D.C. land records. The District's Surveyor and Corporation Counsel had represented throughout that the United States owned the alleys. The evidence contradicting that representation was located in the National Archives, not a "normal" place for a local land records search. J.A. 25.[22] He reopened the case and, after Judge Penn's decision in the Superior Court, granted summary judgment to the plaintiffs. Judge Flannery noted that he had given the United States substantial time to review the records in the Archives, and that the government had raised not a single fact

---

**21.** *See* note 20 and accompanying text *supra.*

**22.** Judge Flannery's appraisal of the case for extraordinary relief is inharmonious with the position taken by the Court of Claims in *1776 K Street Associates v. United States*, 602 F.2d 354

(Ct.Cl.1979) (the *Washington Medical Center* case). However, his determination permitting plaintiffs to proceed in the independent action was not challenged by the United States in this appeal.

indicating that, "on the merits, [the United States] is indeed the owner of the original alleys."[23] His review indicated three assessments: the extensive and prolonged historical research had set the record straight; the United States had been accorded a full and fair chance to litigate; it was time to bring the alley dispute to a final closing.

## II. *Legal Analysis*

### Use of Issue Preclusion as a Sword

Carr and Beuchert were not party to the adjudications concerning original alley closings in the District of Columbia courts or in the Court of Claims. However, the United States defended the District's alley-closing charges in those cases, as it did in the case before us. Carr and Beuchert invoke the adjudication in the District of Columbia courts as a sword; they seek "offensive" use of the issue preclusion (collateral estoppel) principle[24] to foreclose yet another airing of the District's authority to condition original alley closings on payment of a fair market value charge by abutting property owners.

In *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331, 99 S.Ct. 645, 651, 58 L.Ed.2d 552 (1979), the Supreme Court instructed lower federal courts on the "preferable approach" in a case such as this one. No fixed rule precluding or directing the use of offensive collateral estoppel is appropriate, the Court said. Rather, a case by case analysis should be employed. Trial courts should take into account a variety of considerations, all relevant to the ultimate question: Would application of offensive estoppel be unfair to the defendant?[25] Exposing this unique case to the particularized analysis *Parklane* approved, we conclude that the determination in the District of Columbia courts should have issue preclusive effect here.

### Incentive and Opportunity to Litigate

Two considerations are quickly cleared. First, the United States had every incentive to litigate fully and vigorously, and in fact did so, in the District of Columbia courts. Six cases were consolidated in the District of Columbia *C&P Telephone* proceeding;[26] only one alley is involved in the current *Carr* litigation. Nor does the United States suggest it participated with muted zeal in *C&P Telephone*; indeed, the government concedes that it presented in the District of Columbia courts every fact and legal argument it urges here.[27] Second, the United States does not assert, nor could it plausibly, that federal court procedures afford it outcome influencing opportunities unavailable in the District of Columbia courts.

### The Ease of Joining a First Action

*Parklane* cautions lower courts not to reward a plaintiff who "could easily have joined in the earlier action." 439 U.S. at 331, 99 S.Ct. at 651. Carr and Beuchert might have joined the several plaintiffs in the *C&P Telephone* case,[28] but they had compelling reasons to continue the federal court contest. First, *C&P Telephone* was

---

**23.** *Carr III, supra*, slip op. at 7, *reprinted in* J.A. 50. On United States participation in the *Carr* and *C&P Telephone* proceedings, *see* note 12 *supra* and *C&P Telephone*, 106 Daily Wash.L. Rep. at p. 1071.

**24.** As the Supreme Court noted in *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n.4, 99 S.Ct. 645, 648 n.4, 58 L.Ed.2d 552 (1979), "offensive use of collateral estoppel occurs when the plaintiff seeks to foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action with another party. Defensive use occurs when a defendant seeks to prevent a plaintiff from [litigating an issue] the plaintiff has previously litigated and lost against another defendant."

**25.** The Court observed, 439 U.S. at 331 n.16, 99 S.Ct. at 651 n.16, that the approach it outlined is essentially the one advanced in Restatement (Second) of Judgments § 88. *See* Tent. Draft No. 3, 1976, at 161–74.

**26.** *See* note 13 *supra*.

**27.** The active participation of the United States in every aspect of the *C&P Telephone* case as it unfolded in the Superior Court, *see* 106 Daily Wash.L.Rep. at p. 1071, leaves no room for argument that the United States ought not be precluded because it lacked formal party status in *C&P* until it intervened in the D.C. Court of Appeals to obtain the appellate review the District of Columbia refrained from pursuing.

**28.** D.C.Super.Ct.Civ.R. 20(a).

not "the earlier action." It was commenced in 1975, over two years after commencement of the *Carr II* case. Of greater importance, Carr and Beuchert suffered an adverse judgment in the District Court in 1974, and that judgment withstood challenge in this court in 1975 and 1976.[29] Unless Carr and Beuchert prevailed in their effort to set aside the 1974 judgment, they could not have benefited from a decision for plaintiffs in the *C&P Telephone* litigation. They had "everything to lose, and nothing to gain"[30] by abandoning the fray in the District Court.

In short, Carr and Beuchert were not sideline sitters while others carried the ball. They did not adopt the "wait and see" attitude the Supreme Court had in mind when it declared the "general rule" that a plaintiff who "could easily have joined" a prior action may not offensively invoke issue preclusion. 439 U.S. at 330, 331–32, 99 S.Ct. at 651–652. That general rule simply does not fit this exceptional case.[31]

*The Relevance of a Prior Inconsistent Judgment*

*Parklane* also identifies as a factor militating against offensive use of collateral estoppel the existence of a prior inconsistent judgment. 439 U.S. at 330, 99 S.Ct. at 651. *Washington Medical Center*[32] yielded such a judgment, the United States emphasizes. Moreover, the Washington Medical Center, a loser in the Court of Claims, was allowed to relitigate (albeit as to a different alley) in the District of Columbia courts in *C&P Telephone*. It would be ironic, the United States asserts, to allow Carr and Beuchert to invoke the *C&P Telephone* adjudication offensively when the District of Columbia courts in that case rejected the government's plea for defensive use of collateral estoppel against the Washington Medical Center.[33]

We recognize, as the Supreme Court did, that in many cases it would be "unfair to a defendant if the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant." 439 U.S. at 330, 99 S.Ct. at 651. We underscore again, however, that the case before us is atypical. The Court of Claims decision in *Washington Medical Center* was based on an incomplete record. It issued at a time when the Archives research was ongoing.[34] In 1979, when the Court of Claims refused to set aside its 1976 judgment, it appeared to acknowledge the limited effect of that judgment. The 1976 decision was unchallengeable *on its record*, the Court of Claims said. 602 F.2d at 356. It settled the precise claims in suit, it put to rest any controversy concerning the particular alleys the *Washington Medical Center* plaintiffs had paid for without protest. But the Court of Claims observed:

> Plaintiffs do not allege that our former decision is having an adverse collateral estoppel or res judicata effect on other cases. The decisions they do cite would refute such a claim if made.[35]

**29.** *See* pp. 602–603, *supra*.

**30.** *Cf. Parklane Hosiery Co. v. Shore*, 439 U.S. at 330 & n.13, 99 S.Ct. at 651 & n.13.

**31.** For reasoned consideration of the ease of joinder factor, *see Starker v. United States*, 602 F.2d 1341, 1348–50 (9th Cir. 1979).

**32.** *See* pp. 603–604, *supra*.

**33.** Brief for the United States at 10.

**34.** The D.C. Court of Appeals noted that "[t]he Court of Claims was without the benefit of the material from the Archives." *C&P Telephone, supra*, 418 A.2d at 120 n.13. *Cf.* Restatement (Second) of Judgments § 88, comment j, at 169 (Tent. Draft No. 3, 1976) (identifying the disclosure of "new evidence that could likely lead to a different result" as important among circumstances tending against application of issue preclusion).

Of course, no preclusive effect could be claimed for *Washington Medical Center* as to property owners who were not before the court in that case. *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 329, 91 S.Ct. 1434, 1443, 28 L.Ed.2d 788 (1971).

**35.** *1776 K Street Associates*, 602 F.2d at 358. The Court of Claims thus recognized that newly discovered evidence, even if insufficient to justify setting aside a judgment, may warrant refusal to give the judgment preclusive effect in other actions. *See* Restatement (Second) of Judgments § 88, comment j, at 169 (Tent. Draft No. 3, 1976); *cf. Blonder-Tongue Laboratories*,

We conclude that the *Washington Medical Center* decision, based as it was on a record that did not include the Archives evidence, should not block reliance in *Carr* on the *C&P Telephone* adjudication. The District of Columbia courts carefully canvassed a full record. It would have been an inordinate waste of judicial resources for the District Court to retread the same ground.

*The Quiet Title Characterization*

In the District Court, in this court, and in the District of Columbia courts, the United States consistently urged that the alley-closing disputes are in reality quiet title actions governed by 28 U.S.C. § 2409a (1977).[36] Exclusive jurisdiction to quiet title to real property in which an interest is claimed by the United States resides in the district courts. *Id.* § 1346(f). Hence, the United States concludes, the District of Columbia courts lacked subject matter jurisdiction in the *C&P Telephone* cases. Moreover, the limitation period for actions to quiet title to land in which the United States claims an interest is 12 years, 28 U.S.C. § 2409a(f) (1977), a period the United States asserts has "long since expired."[37]

We find the argument farfetched. First, we note a certain lapse on the part of the United States in pressing the characterization. The District of Columbia's authority to impose a sale charge for an alley closing turns on United States ownership of the alley. Therefore, the United States maintains, "this case is in fact a quiet title action, and it cannot be anything else."[38]

Significantly, the United States takes no such position with respect to the Court of Claims adjudication in *Washington Medical Center.*

Decision in *Washington Medical Center* also turned on United States ownership of original alleys. The logic is inescapable that if this case cannot be anything but a quiet title action, the Court of Claims case[39] could not have been "anything else" either. But we do not rest our determination on the United States treatment of the quiet title characterization as a "sometimes thing." We merely observe that on another day, the United States thought a tribunal other than a federal district court had authority to decide as a threshold matter whether the United States owned original alleys.

As the D.C. Court of Appeals stated,[40] abutting property owners in the alley-closing cases were not bringing an action to establish title. They challenged action by the D.C. Council—imposition of a fair market value charge for alley space closed—as beyond the authority of that body under the Street Readjustment Act.[41] Title figured in the litigation as the pivotal issue, but it was a question incidental to the matter directly in controversy.[42]

While we view the *C&P Telephone* case and, indeed, the *Washington Medical Center* case, as instances in which a court legitimately determined incidentally an issue it lacks jurisdiction to determine directly,[43] the argument presented by the United

---

Inc. v. University of Illinois Foundation, 402 U.S. 313, 333, 91 S.Ct. 1434, 1445, 28 L.Ed.2d 788 (1971); *State Farm Fire & Casualty Co. v. Century Home Improvements, Inc.,* 275 Or. 97, 550 P.2d 1185, 1191 (1976).

**36.** *See* Brief for the United States at 14–19.

**37.** *Id.* at 18.

**38.** *Id.* at 16. *But see id.* at 19–20 & n.7 (suggesting United States may have acquired the alleys by occupation, in which event "no quiet title suit is proper").

**39.** In *Washington Medical Center,* the United States asked the Court of Claims to rule: (1) plaintiffs stand estopped from claiming refunds of alley-closing charges because they paid the

charges without protest, and (2) the United States had fee simple title to the original alleys, hence the District of Columbia was fully authorized to make the charges. 545 F.2d at 120.

**40.** *C&P Telephone,* 418 A.2d at 117.

**41.** *Supra* note 5.

**42.** For the D.C. Court of Appeals' reasoning and conclusion to this effect, *see C&P Telephone,* 418 A.2d at 117.

**43.** *See* Restatement (Second) of Judgments § 68.1, comments d & e, at 35, 37–38 (Tent. Draft No. 4, 1977).

States encounters another shoal. The D.C. Court of Appeals, in response to the objection raised by the United States, expressly determined that it had subject matter jurisdiction in the *C&P Telephone* contest.[44] We decline the invitation to sideswipe that determination:

> When the question of the tribunal's [subject matter] jurisdiction is raised in the original action, in a modern procedural regime there is no reason why the determination of the issue should not therefore be conclusive under the usual rules of issue preclusion. The force of the considerations supporting preclusion is at least as great concerning determinations of the issue of jurisdiction as it is with respect to other issues.

Restatement (Second) of Judgments § 15, comment c at 154 (Tent. Draft No. 6, 1979); see *Durfee v. Duke*, 375 U.S. 106, 84 S.Ct. 242, 11 L.Ed.2d 186 (1963).[45]

Nor can we credit the contention that issue preclusion should be withheld because *C&P Telephone* and the instant case involve "a pure question of law, the interpretation of undisputed facts and documents as a matter of federal law."[46] The "fact/law" characterization of the issue before us is not critical; it is today well accepted that issue preclusion applies to questions of law and law application as well as to questions of fact.[47] Moreover, what we have said as to the preclusive effect of subject matter jurisdiction determinations sufficiently answers this further contention on the part of the United States.[48]

### Conclusion

The precise question we decide today bears restatement. The D.C. Court of Appeals did not rule directly and dispositively that owners of parcels abutting original alleys hold title to the alleys, nor do we.[49]

---

**44.** *C&P Telephone*, 418 A.2d at 117.

**45.** We do not regard this case as the exceptional situation in which a jurisdictional question raised, litigated and decided is nonetheless subject to a second look. *See* Restatement (Second) of Judgments § 15, Reporter's Note, at 161–64 (Tent. Draft No. 6, 1979).

**46.** Brief for the United States at 13.

**47.** *See* Restatement (Second) of Judgments § 68, at 1, 4, 18–19 (Tent. Draft No. 4, 1977); *id.* § 68.1(b). An issue subject to preclusion may be one of "evidentiary fact," "ultimate fact" or law. *Id.* § 68, comment c, at 4. A question of law falls outside the general rule of issue preclusion when (1) the two actions involve substantially unrelated claims, or (2) a new determination is warranted to account for an intervening change in the applicable law or to avoid inequitable administration of the law. *Id.* § 68.1(b). Neither exception is relevant here.

Where there is a lack of total identity between the matter presented in the first and second actions, a key factor in deciding whether the issue of fact or law involved is "the same," is the degree of overlap between the evidence and argument to be advanced in the second proceeding, and that advanced in the first. *Id.* § 68, comment c, at 3. *Carr* and *C&P*

*Telephone* were not totally identical. Different alleys were involved in the two cases. But the United States concedes there was no evidence or argument to present to Judge Flannery or to this court that had not been presented earlier to Judge Penn or to the D.C. Court of Appeals.

**48.** Nor do the well-reasoned opinions of the District of Columbia courts in *C&P Telephone* afford any basis for suspecting that those courts "inaccurately or unsympathetically comprehended" the arguments made by the United States. *Cf.* Restatement (Second) of Judgments § 134, comment b, at 73 (Tent. Draft No. 7, 1980). We find nothing in the District of Columbia courts' adjudication that threatens the viability of *DeGuyer v. Banning*, 167 U.S. 723, 17 S.Ct. 937, 42 L.Ed. 340 (1897). *Compare* Brief for the United States at 24–30, *with C&P Telephone*, 418 A.2d at 121. And we regard as extravagant the suggestion made at oral argument that the resolution of this unique alley-closing controversy by the District of Columbia courts will encourage state courts hostile to federal interests to aid local citizens in maneuvers jeopardizing United States land holdings.

**49.** The District Court appropriately characterized the title question as "incidental." The court's further statement, that "[t]he plaintiffs

That court did rule definitively that the D.C. Council was without authority under the Street Readjustment Act and related D.C. Code provisions to impose a sale charge for an original alley closing.[50] We hold that further contest on that ultimate issue is precluded here. Accordingly, we reject the request by the United States that we review the "undisputed facts and [public] documents,"[51] and make our own decision on the merits. The decision on the merits made in the District of Columbia courts is that the D.C. Council lacks discretion under the relevant legislation to condition original alley closings on payment of a fair market value price.[52] That once arguable question, we hold, cannot be argued anymore.

*Affirmed.*

presently have title to the land," *Carr III, supra,* slip op. at 9, *reprinted in* J.A. 52, was unnecessary to the decision.

**50.** The District of Columbia did not appeal from the Superior Court judgment in the *C&P Telephone* case, *see* note 12 *supra,* nor has it appealed from the District Court's final judgment in this action.

**51.** Brief for the United States at 13–14.

**52.** The United States does not now contend, and the Street Readjustment Act would not permit it to do so, that the District is *required* to impose a charge for closing an original alley. *See* note 9 and accompanying text *supra.*